# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| LR TRUST, derivatively on behalf of SUNTRUST BANKS, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> WILLIAM H. ROGERS, JR., PAUL R. GARCIA, M. DOUGLAS IVESTER, KYLE PRECHTL LEGG, DONNA S. MOREA, DAVID M. RATCLIFFE, FRANK P. SCRUGGS, JR., THOMAS R. WATJEN, DR. PHAIL WYNN, JR., ROBERT M. BEALL, II, DAVID H. HUGHES, WILLIAM A. LINNENBRINGER, JEROME T. LIENHARD II, <br><br> *Defendants,* <br><br> and <br><br> SUNTRUST BANKS, INC., a Georgia corporation, <br><br> *Nominal Defendant.* | Civil Action No. _____ |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff LR Trust ("Plaintiff or "LR Trust"), by and through its undersigned counsel, respectfully submits this Verified Stockholder Derivative Complaint on behalf of nominal defendant SunTrust Banks, Inc. ("SunTrust" or the "Company") against certain of its directors and officers named herein (the "Individual Defendants," as defined below, and collectively with SunTrust, the "Defendants"). Plaintiff bases its allegations on personal knowledge as to its own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including:  (a) review of the Consent Judgment pursuant to which the Company admitted that it systematically filed false certifications, violated numerous Federal and State laws, and engaged in a pattern of unfair and deceptive acts and practices; (b) review of the Company's settlement agreement with the United States Attorney for the Western District of Virginia, pursuant to which it admitted legal violations and misconduct in its administration of a government mortgage relief program; (c) review of other government reports; (d) review of documents relating to a complaint against the Company pending in Bankruptcy Court concerning representations made by the Company when selling mortgage loans; (e) review of class action lawsuits by homeowners and employees; (f) review and analysis of public filings made by SunTrust with the United States Securities and Exchange Commission ("SEC"); (g) review and analysis of press

releases and other publications caused or allowed to be disseminated by the Company, certain of the Defendants, and other persons; (h) review of news articles, shareholder communications, and postings on SunTrust's website concerning the Company's public statements and the conduct of the Individual Defendants; and (i) review of other publicly available information concerning SunTrust, the Individual Defendants, and other persons.

## **INTRODUCTION**

1.      The Officers and Directors of SunTrust, and its wholly owned subsidiary, SunTrust Mortgages, Inc. ("STM"), routinely and systematically engaged in illegal conduct to the detriment of the Company, its stockholders, its customers, and its business partners.  SunTrust was caused to engage in mortgage modification fraud and to violate the Consumer Financial Protection Act of 2010, the False Claims Act, the Financial Institutions Reform Recovery and Enforcement Act of 1989, the Bankruptcy Code, regulations promulgated by the Department of Housing and Urban Development ("HUD"), requirements for originating Federal Housing Administration ("FHA") mortgage loans, the requirements of the Home Affordable Modification Program ("HAMP"), contractual obligations regarding the sale of mortgage loans, and the unfair and deceptive practices acts of the individual States.

2

2.     Internally, it was well known that the Company was operating with ineffective internal controls; that its staff responsible for conducting the Company's business was not sufficiently trained; and that SunTrust was being caused to routinely violate these laws.  These material deficiencies were repeatedly flagged in internal audit reports and other internal documents, which specifically noted, among other things, the lack of sufficient documentation to evidence compliance with HUD quality control requirements and the persistence of unacceptably high error rates for the origination of FHA-insured mortgages -- ranging as high as 59%.

3.     Indeed, the violations of the Company's legal obligations were glaringly obvious.  One of the numerous governmental investigations spawned by this illegal conduct found that so many unprocessed applications from homeowners for relief under HAMP were tossed into a room that its floor actually buckled under the weight.  The Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") found that "[t]he negligence with which SunTrust administered its HAMP program is appalling, miserable, and repulsive."

4.     Regardless, the Individual Defendants persisted in their indolence – taking no action to ensure that these enterprise threatening activities were remedied; holding no one accountable.

5.      As a consequence of the Individual Defendants' sustained failure to fulfill their fiduciary duties, SunTrust has suffered enormous financial, regulatory, and reputation damage, including:

(a)     payment of $500 million in relief directly to homeowners and borrowers;

(b)     payment of $418 million to resolve its potential liability under the Federal False Claims Act;

(c)     payment of up to $284 million in consumer remediation;

(d)     payment of $20 million to fund housing counseling for homeowners;

(e)     payment of $10 million in restitution to the Federal National Mortgage Associate ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac");

(f)     a cash payment of $16 million to the United States Treasury;

(g)     a Department of Justice ("DOJ") investigation of the origination and underwriting of single-family-residential mortgage loans sold to Fannie Mae and Freddie Mac;

(h)     a United States Attorney's Office for the Southern District of New York investigation regarding foreclosure-related expenses charged by law firms in connection with the foreclosure of loans guaranteed or insured by Fannie Mae, Freddie Mac, or FHA;

(i)     a lawsuit brought by Residential Funding Company, LLC concerning the sale of mortgages for securitization;

(j)     several homeowner-filed class action lawsuits alleging overcharging for force-placed insurance; and

(k)     homeowner-filed class action lawsuits alleging STM used a private mortgage insurer who provided kickbacks to STM.

4

6.     All told, to date, SunTrust has suffered massive damages of over $900 million, and its internal control processes and oversight, as well as its corporate governance practices, have been exposed as insufficient.

7.     Plaintiff demanded that SunTrust's Board take action to recover its damages from those who caused this material harm, and that it cure the internal control and corporate governance deficiencies.  While Plaintiff has cooperatively worked with the Company, his demand has been rejected.

8.     SunTrust formed a Demand Review Committee (the "DRC"), a committee of outside directors, to investigate and consider Plaintiff's Demand. The decision of the DRC and the Board to refuse Plaintiff's Demand was not based on a reasonable investigation of the claims.  The decision is neither rational nor the product of independent and disinterested directors.  As such, the LR Trust brings this action for the benefit of SunTrust to recover the Company's damages, and cause the implementation of the demanded internal control and governance practice reforms.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as all Defendants have diversity of citizenship with Plaintiff, and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over all Defendants because they either reside in this jurisdiction or have a substantial connection to this forum through their positions at SunTrust and were involved in many of the relevant events addressed herein and occurring in Atlanta, Georgia.

11.     Venue is proper under 28 U.S.C. § 1391 because SunTrust maintains its headquarters in this judicial district and a substantial part of the events and omissions giving rise to this action occurred in this judicial district.

### THE PARTIES

12.     Plaintiff, the LR Trust, is a current shareholder of SunTrust and has continuously owned SunTrust common stock at all relevant times.  The LR Trust, its settlor, trustee and all beneficiaries are citizens of the State of New York.

13.     Nominal Defendant SunTrust is a corporation duly organized and existing under the laws of the State of Georgia.   SunTrust maintains its headquarters at SunTrust Plaza, 303 Peachtree Street NE, Atlanta, Georgia 30308. SunTrust is one of the nation's largest bank holding companies, operating out of the Southeastern Mid-Atlantic region of the United States.

14.     Defendant William H. Rogers, Jr. ("Rogers") is Chairman of the Board ("Chairman") and Chief Executive Officer ("CEO") of SunTrust.  He is also a member of the Board's Executive Committee.   Rogers assumed the role of

Chairman in January, 2012.  He was named CEO in June 2011, after having served as Chief Operating Officer since November 2010 and President since December 2008.  Rogers is a citizen of the State of Georgia.

15.     Defendant Paul R. Garcia ("Garcia") is a member of the SunTrust Board and the Board's Compensation Committee and Risk Committee.  Garcia is a citizen of the State of Georgia.

16.     Defendant M. Douglas Ivester ("Ivester") is a member of the SunTrust Board and the Board's Executive Committee, Governance and Nominating Committee, and Risk Committee.  Ivester is a citizen of the State of Georgia.

17.     Defendant Kyle Prechtl Legg ("Legg") is a member of the SunTrust Board and the Board's Executive Committee, Audit Committee, and Compensation Committee.  Legg is a citizen of the State of Maryland.

18.     Defendant Donna S. Morea ("Morea") is a member of the SunTrust Board and the Board's Compensation Committee and Risk Committee.  Morea is a citizen of Washington, D.C.

19.     Defendant David M. Ratcliffe ("Ratcliffe") is a member of the SunTrust Board and the Board's Executive Committee, Compensation Committee, and Risk Committee.  Ratcliffe is a citizen of the State of Georgia.

20.     Defendant Frank P. Scruggs, Jr. ("Scruggs") is a member of the SunTrust Board and the Board's Compensation Committee and Risk Committee. Scruggs is a citizen of the State of Florida.

21.     Defendant Thomas R. Watjen ("Watjen") is a member of the SunTrust Board and the Board's Executive Committee, Audit Committee, and Risk Committee.  Watjen is a citizen of the State of North Carolina.

22.     Defendant Dr. Phail Wynn, Jr. ("Wynn") is a member of the SunTrust Board and the Board's Executive Committee, Audit Committee, and Governance and Nominating Committee.  Wynn is a citizen of the State of North Carolina.

23.     Defendant Robert M. Beall, II ("Beall") was a member of the SunTrust Board from 2004 until his retirement in April 2016.  Beall was also a member of the Board's Audit Committee and Compensation Committee.  Beall is a citizen of the State of Florida.

24.     Defendant David H. Hughes ("Hughes") was a member of the SunTrust Board from 1984 until his retirement in April 2016.  Hughes was also a member of the Board's Governance and Nominating Committee and Risk Committee.  Hughes is a citizen of the State of Florida.

25.     Defendant William A. Linnenbringer ("Linnenbringer") was a member of the SunTrust Board of Directors from 2010 until April 2016.

Linnenbringer was also a member of the Board's Audit Committee and Governance and Nominating Committee. Linnenbringer is a citizen of the State of Missouri.

26.    Defendants Rogers, Garcia, Ivester, Legg, Morea, Ratcliffe, Scruggs, Watjen, Wynn, Beall, Hughes, and Linnenbringer are collectively referred to as the "Director Defendants."

27.    Defendant Jerome T. Lienhard, II ("Lienhard") is the President and CEO of STM since March 2011. He is responsible for SunTrust's mortgage production, servicing, operations, and secondary marketing and technology areas. Previously, he served as Executive Vice President of Strategic Finance and Administration, overseeing Strategic Sourcing, Corporate Real Estate, and Strategic Finance and Performance Management. Lienhard is a citizen of the State of Georgia.

28.    Defendant Lienhard and the Director Defendants are collectively referred to as the "Individual Defendants."

### THE INDIVIDUAL DEFENDANTS' DUTIES

29.    By reason of their position as officers, directors, and/or fiduciaries of SunTrust and because of their ability to control the business and corporate affairs of SunTrust, the Individual Defendants owed SunTrust and its shareholders

fiduciary obligations of good faith, loyalty, and diligence; were and are required to use their utmost ability to control and manage SunTrust in a fair, just, honest, and equitable manner and ensure that SunTrust had complied and was complying with prudent (and with its own) origination, underwriting, and quality control standards; were and are required to ensure that key mortgage underwriting functions were being delegated to trained and qualified employees; and were and are required to ensure that reasonable and adequate compliance and internal controls and effective corporate governance practices and procedures were in place.

30.     The Individual Defendants were also required, in accordance with the Code of Business Conduct and Ethics for Members of the Board of Directors, to "promote ethical behavior and ensure the Company: (a) encourages employees to talk to supervisors, managers, and other appropriate personnel when in doubt about the best course of action in a particular circumstance; (b) encourages employees to report violations of laws, rules, regulations or the Company's Employee Code of Business Conduct and Ethics to appropriate personnel; and (c) informs employees that the Company will not allow retaliation for reports made in good faith."

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SunTrust, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

Because of their advisory, executive, managerial, and directorial positions with SunTrust, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.

32.     To discharge their duties, the officers and directors of SunTrust were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of SunTrust were required, among other things, to:

    a.    Ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.    Ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.    When put on notice of problems with the Company's business practices and operations, take appropriate action to correct the misconduct and prevent its recurrence.

## ADDITIONAL DUTIES OF THE AUDIT COMMITTEE

33.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee had the responsibility, among other things, to:

    a.    Monitor the integrity of the Company's financial statements, the independence and qualifications of its external auditor, the Company's system of internal controls, the performance of the Company's internal audit process and external auditor, and the

Company's compliance with laws, regulations, and its codes of conduct.

b.    Appoint, compensate, retain, and directly oversee the work of the Company's external auditor, resolve any disagreements between management and the external auditor regarding financial reporting, and pre-approve all audit services and permitted non-audit services provided that decisions to grant pre-approvals shall be presented to the full committee at its next scheduled meeting.

c.    Review and discuss with management and the external auditor significant accounting and financial reporting issues, including complex or unusual transactions and judgments concerning significant estimates or significant changes in the Company's selection or application of accounting principles, and recent professional, accounting, and regulatory pronouncements and initiatives, and understand their impact on the Company's financial statements.

d.    Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

e.    Review with management and the external auditor all matters required to be communicated to the Committee under the standards of the Public Company Accounting Oversight Board ("PCAOB") and Generally Accepted Auditing Standards, including matters required to be discussed by Statement on Auditing Standards No. 61 and PCAOB Auditing Standard 16, as applicable. Inquire of the CEO and CFO regarding the "quality of earnings" of the Company from a subjective as well as an objective standpoint.

f.    Meet with management to review the Company's major financial reporting risk exposures and the steps management has taken to monitor and control such exposures.

g.  Review ineffective-rated audit reports prepared by internal audit and management's responses as well as other significant reports to management.

h.  Review the effectiveness of the system for monitoring compliance with laws and regulations regarding financial reporting. The results of management's investigation and follow-up (including disciplinary action) should also be reviewed.

i.  Review and discuss with management and the external auditor any correspondence with or the findings of any examinations by, regulatory agencies, published reports, or auditor observations that raise significant issues regarding the Company's financial statements or accounting policies.

j.  Obtain regular updates from management and Company counsel regarding compliance matters and legal matters that may have a significant impact on the financial statements.

k.  Take into consideration the Board's assignment of responsibility for review of the Company's compliance risk management framework to the Board's Risk Committee,  obtain  regular  updates  from management and Company counsel   regarding compliance matters and legal matters that may have a significant impact on the Company's compliance policies and advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

l.  Regularly report to the Board about Committee activities, issues, and related recommendations, including any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's external auditors or the performance of the internal audit function.

m.  Take into consideration the Board's assignment of responsibility for review of the Company's enterprise risk management framework, including the significant  policies, procedures, and practices employed to manage credit risk, market risk, and operational risk to the Board's

Risk Committee, discuss with management guidelines and policies for assessing and managing the Company's exposure to risks, including reputation risk, the Company's major financial exposures and the steps management has taken to monitor and control such exposures.

n.    Coordinate with the Risk Committee the exchange of information and reports regarding the activities of both committees, as necessary and appropriate.

## ADDITIONAL DUTIES OF THE RISK COMMITTEE

34.    Pursuant to the Charter of the Risk Committee, the members of the Risk Committee had the responsibility, among other things, to receive information pertaining to, and act on its behalf regarding, oversight, review, challenge and, approval and/or recommend approval of:

a.    The charters of the Corporate Asset/Liability Management Committee, the Corporate Risk Committee, the Corporate Portfolio Management Committee, Capital Committee and other enterprise governance committees, if any, each calendar year, or more frequently if conditions warrant.

b.    Enterprise risk management appetite, tolerances, limits and/or standards; frameworks; and policies that reflect the Board's risk management philosophies and principles, or for which for which management oversight is mandated by law or regulation. The Committee maintains the right to authorize management to develop and implement additional frameworks and policies relating to risk, fiduciary, liquidity and/or capital management, as appropriate.

c.    Enterprise credit risk management activities, *e.g.*, asset quality and credit management process.

d.    Liquidity risk management activities, including the structure and adequacy of liquidity in light of current and planned business

activities, and management, Board and statutory/regulatory requirements or expectations.

e.      Capital management activities, including periodic (at least quarterly) review of the structure and adequacy of capital in light of current or planned business activities; annual approval of the Capital Plan and planned capital actions in conjunction with review of capital planning activities; and other management, Board and statutory/regulatory requirements or expectations.

f.      The structure and adequacy of capital in light of current or planned business activities, and management, Board and statutory/regulatory requirements or expectations.

## STATEMENT OF FACTS

### A.   SunTrust's Business

35.    SunTrust is a Georgia-based bank holding company, operating banking centers across the Southeastern Mid-Atlantic region of the United States. Through its various subsidiaries, the Company provides mortgage banking, asset management, securities brokerage, and capital market services.

36.    STM is the mortgage origination and servicing arm of SunTrust. STM services loans owned by both private-sector financial institutions, as well as government-sponsored enterprises.    In 2009, when HAMP was instituted, approximately 73% of the roughly 950,000 mortgage loans serviced by STM were owned by government-sponsored enterprises.

37.    Due to the nature of SunTrust's business, its operations are subject to significant legal and regulatory requirements, which include, but are not limited to, regulation, examination, and supervision by, among others, the Office of the Comptroller of the United States Department of the Treasury, and examination and supervision by the Federal Deposit Insurance Corporation.

## B.    THE DOJ ACTION

38.    The United States Government investigated SunTrust's reckless or fraudulent mortgage lending practices, including misconduct in connection with mortgage lenders' participation in the Direct Endorsement Lender ("DEL") program, a federal program administered by the FHA.  The results of the SunTrust investigation have been publicly released, and the facts therein are devastating to SunTrust and its shareholders.

39.    On June 17, 2014, the DOJ, HUD, the Consumer Financial Protection Bureau (the "CFPB"), along with 49 State Attorneys General and the District of Columbia's Attorney General had filed, and simultaneously settled pursuant to a Consent Judgment (the "Consent Judgment"), a civil lawsuit against STM for violations of the Unfair and Deceptive Acts and Practices laws of the individual States, the Consumer Financial Protection Act of 2010, the False Claims Act, the

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

40.    In the Consent Judgment, STM admitted, acknowledged, and accepted responsibility for submitting false certifications to HUD.  The false certifications induced the FHA to accept ineligible loans for government insurance, resulting in losses to HUD when it paid insurance claims on those loans.

41.    According to the Consent Judgment, STM had been a participant in the DEL program between January 2006 and March 2012.  The DEL program authorizes private-sector mortgage lenders to endorse mortgage loans for HUD insurance, including determining a borrower's creditworthiness and whether the proposed loan meets all applicable HUD requirements, without any review of the mortgage application by HUD.  Consequently, it is crucial that Direct Endorsement Lenders follow the HUD requirements in determining which loans to approve. Direct Endorsement Lenders are required to, among other things, implement and maintain a quality control program in accordance with HUD Handbook requirements for FHA loans, and to take prompt action to deal appropriately with any material findings.

42.    In its investigation, and prior to charging SunTrust with violations of numerous federal and state laws, the DOJ reviewed internal documents of

17

SunTrust.  The Government found that between January 2009 and March 2012, STM's internal quality control report documented 256 FHA mortgage loans originated by STM with a Level 1 risk grade, which captured material underwriting issues broader than the self-reporting standard set forth in the HUD-FHA guidelines.  During this same time period, SunTrust only self-reported to HUD 11 materially deficient mortgages.

43.    The DOJ investigation uncovered numerous documents demonstrating SunTrust's knowledge that its personnel were not adequately trained to perform their jobs.  Indeed, an October 2009 internal presentation regarding "broken loans" stated, in part, that STM underwriters received "less training than those at other mortgage companies."  The presentation also stated that with respect to FHA loans, these "loans are more complicated to underwrite and will likely continue to be scrutinized given the overall reserve situation."

44.    The DOJ uncovered evidence that SunTrust management recognized the material risks it was facing due to its problems with mortgage underwriting.  Indeed, a December 2009 internal presentation noted that STM management had identified problems regarding, among other things, income calculation, appraisals, data integrity, asset documentation, and misrepresentations relating to falsified

bank statements.  The presentation noted solutions to these problems had not been completed or implemented "due to multiple demands and shifting priorities."

45.     The DOJ found that STM's internal auditors, in an internal STM Audit Report from 2009 distributed to SunTrust management, stated with regard to SunTrust's FHA origination and underwriting that "the system of internal control is ineffective."  The Audit Report flagged certain issues contributing to the lack of effective internal controls:

> Three significant control weaknesses impair the overall system of internal control.  The first significant issue is the lack of consistent performance reviews on each underwriter to assess their performance and the quality of underwriting decisions.  The second significant issue is the lack of standards over the timing of when loan approval conditions must be cleared (*e.g.*, prior to close vs. at close) and which conditions or tasks must be performed by the underwriter.  The third significant issue is insufficient loan origination/underwriting training due to the lack of instructor-led curriculum, case studies, and annual refresher training.  STM Audit Services believes these three control weaknesses are key catalysts to the high level of errors and loan defects identified in 2009 by the SunTrust Mortgage Quality Control Team.

46.     Regarding the lack of consistent performance reviews on underwriters, the "Management Action Plan" portion of the 2009 Audit Report stated that "[m]anagement agrees with this finding and recognized this weakness mid-2009 when volume prevented Group Underwriting Managers from consistently performing this function.  It should be noted that the Group Managers

have been performing this type of performance review, but there has been no consistency, no documented policy, and no control to escalate to senior management when resources prevented the activity from occurring."

47.   The DOJ found that a July 19, 2010 internal STM presentation acknowledged, with regard to SunTrust-originated FHA mortgages, that the quality control "error rate is at an unacceptable level."  The presentation further stated that prior to July 2010, the "sampling size and methodology" in SunTrust's quality control process had been "severely flawed."

48.   The DOJ investigation turned up a 2010 STM Internal Audit Report of the quality control process distributed to SunTrust management.  The Internal Audit Report noted with regard to FHA mortgages that the "controls need improvement."  The Internal Audit Report flagged the lack of an effective system of internal controls, noting that "[a]lthough Material and Significant defects have been reported at elevated levels for the past several years, the actual volume of defects has been underreported, unclearly defined, and inconsistently applied."  The Internal Audit Report further noted "the lack of sufficient documentation to evidence compliance with…HUD quality control requirements."

49.   Another 2010 STM Internal Audit Report distributed to management stated that "the overall system of internal control…is ineffective," and "identified

pervasive weaknesses in many controls that…impair continuity and consistency of operations and management's ability to generate high-quality loans."

50.    A 2011 STM Internal Audit Report distributed to management stated that "the overall system of controls is ineffective" and that "[s]ince July 2011, the Quality Control (QC) function has reported total error rates on monthly loan production of 36% to 59%."

51.    A June 2011 STM Internal Audit Report stated that the system of internal controls around the insuring of FHA-insured mortgages "needs improvement" and further stated that "the volume of technical defects, procedural errors, and noncompliance with underwriting rules is excessive."  In a sample of 519 FHA-insured mortgages from June 2010 to March 2011, Production Quality Control found errors or exceptions in 41%.  The Internal Audit Report further stated that "[FHA] require[s] SunTrust to certify that the loan is eligible for government insurance in conformance with [FHA] requirements.  Lenders who submit false certifications and claims may be subject to penalties or lawsuits under the False Claims Act (31 U.S.C. § 3729)."

52.    A 2011 Internal Audit Report of STM's quality control process distributed to SunTrust management stated that additional improvements were needed for the "ongoing high volume of loan production errors," that "employment

and deposit verifications on FHA" mortgages "do not consistently comply with standards" and "that the QC process for documenting employment and asset" re-verifications was "restricted by the limitations of a manual (Excel) environment."

53.    The DOJ investigation uncovered a 2012 STM Internal Audit Report regarding the government insurance department distributed to SunTrust management that declared there had been no improvement in processes and controls since the June 2011 audit.  The Report also noted two significant issues, the "Broken Loan Origination Process" and "Deficient Government Insuring Process."  The "Broken Loan Origination Process" issue noted that "the excessive level of pended loans (51% as of March 2012) is essentially the same level of error observed in the last audit dated June 14, 2011…."  The "Deficient Government Insuring Process" issue in the Report noted that the "Quality Control team has identified a[n up to] 56% defect rate on [FHA] loans originated from January to March 2012."

54.    The CFPB, DOJ, HUD, and State Attorneys General uncovered substantial evidence that STM was engaged in systemic mortgage-servicing misconduct, and specifically alleged that in the course of its conduct, SunTrust management engaged in a pattern of unfair and deceptive acts and practices.  These practices include, but are not limited to:

- Failing to timely and accurately apply payments made by borrowers;

- Failing to maintain accurate account statements;

- Charging unauthorized fees for default-related services;

- Imposing force-placed insurance when STM knew, or should have known, that borrowers already had adequate coverage; and

- Providing false or misleading information in response to borrower complaints.

55. With respect to STM's loan-modification and loss-mitigation processes, the CFPB, DOJ, HUD, and State Attorneys General alleged STM engaged in the following, among other, acts and practices:

- failing to perform proper loan-modification underwriting;

- failing to gather, or losing, loan-modification application documentation and other paperwork;

- failing to provide adequate staffing to implement programs;

- failing to adequately train staff responsible for loan modifications;

- failing to establish adequate processes for loan modifications;

- allowing borrowers to stay in trial modifications for excessive time periods;

- wrongfully denying modification applications;

- failing to respond to borrower inquiries;

- providing false or misleading information to consumers about the status of loss-mitigation review, including while referring loans to foreclosure;

- providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was, in good faith, actively pursuing a loss-mitigation alternative offered by STM;

- misrepresenting to borrowers that loss-mitigation programs would provide relief from the initiation of foreclosure or from further foreclosure efforts;

- failing to provide accurate and timely information to borrowers who sought information about loss-mitigation services, including loan modifications;

- falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

- failing to properly calculate borrowers' eligibility for loan-modification programs and improperly denying loan-modification relief to eligible borrowers;

- misrepresenting to borrowers that loan-modification applications will be handled promptly when STM regularly failed to act on loan modifications in a timely manner;

- failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance and, as a result, denying loan modifications to consumers who were eligible;

- failing to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

- providing false or misleading reasons for denial of loan modifications.

56.    With respect to STM's conduct related to foreclosures, the CFPB, DOJ, HUD, and State Attorneys General alleged that STM engaged in the following, among other, acts and practices:

- failing to properly identify the foreclosing party;

- charging unauthorized fees related to foreclosures;

- preparing, executing, notarizing, or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

- preparing, executing, notarizing, and filing affidavits in foreclosure proceedings, the affiants of which lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits ;

- executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

- misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

- inappropriately charging servicing, document-creation, recordation, and other costs and expenses related to foreclosures;

- inappropriately dual-tracking foreclosure and loan modification activities; and

- failing to communicate with borrowers with respect to foreclosure activities.

57.   SunTrust has been materially damaged by the Individual Defendants' misconduct.  Pursuant to the June 2014 Consent Judgment, STM agreed to provide $500 million in relief directly to borrowers and homeowners.  STM has also agreed to pay $50 million in cash to redress its mortgage servicing practices, $40 million

of which will be distributed to borrowers and homeowners.  Moreover, as part of the June 2014 Consent Judgment, STM agreed to pay $418 million to resolve its potential liability under the federal False Claims Act for originating and underwriting loans that violated its obligations as a participant in the FHA insurance program.

58.    On August 4, 2016, SunTrust filed their Form 10-Q with the SEC, which stated that the Company made the $50 million in cash payments, and that, while subject to confirmation by the independent Office of Mortgage Settlement Oversight, the Company "believes it has fulfilled its consumer relief commitments."

## C.  MORTGAGE MODIFICATION INVESTIGATION AND SETTLEMENT

59.    On July 3, 2014, SunTrust announced that STM and the United States Attorney for the Western District of Virginia reached an agreement to settle certain legal violations regarding STM's administration of HAMP (the "HAMP Settlement") uncovered in an investigation by the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), and the Office of the Inspector General for the Federal Housing Finance Agency ("FHFA-OIG").

60.    As part of the HAMP Settlement, STM accepted and acknowledged responsibility for its conduct and the conduct of its employees, and conceded that

its administration of the HAMP program from March 2009 through at least December 2010 had numerous deficiencies and harmed a significant number of homeowners.

61.    In the settlement agreement, STM admitted statements it made to its customers were not accurate and that thousands of homeowners who applied for a HAMP modification with STM suffered harm including damage to their credit scores, excessive capitalized interest, and the deprivation of their ability to make an informed choice about how to save or dispose of their homes.  These admissions also include, but are not limited to:

- STM under-resourced and under-funded its HAMP Program and did not have adequate personnel, infrastructure, and technological resources in place to process the paperwork, render decisions, and communicate with and about borrowers, as represented in 2009 and 2010;

- STM extended trial periods, which resulted in the loss of other options for disposing of or saving borrowers' homes;

- STM improperly reported borrowers as delinquent to credit bureaus;

- STM capitalized improper amounts of interest onto borrowers' unpaid principal;

- STM improperly denied borrowers relief from HAMP;

- STM improperly commenced foreclosure activity; and

- STM penalized borrowers who were transferred from STM to another servicer while on active HAMP trial.

62.    The investigators found that the staff STM did have was not properly trained, as they had received no formal training on HAMP guidelines or processes.

63.    The investigation further determined that STM had no effective document management system in place.  Indeed, the SIGTARP noted in its July 3, 2014 press release that SunTrust put so many "unopened homeowners' HAMP applications in a room" that the "floor actually buckled under the sheer weight of unopened document packages."  According to SIGTARP, the cause of this neglect was SunTrust's unwillingness to put resources into HAMP "despite holding billions in TARP funds."

64.    SunTrust was materially damaged as a result of the Individual Defendants' misconduct in connection with SunTrust's implementation of its HAMP program.  In the HAMP Settlement, STM was required to commit to providing a maximum of $284 million in consumer remediation, $20 million to fund housing counseling for homeowners, $10 million in restitution to Fannie Mae and Freddie Mac, and a cash payment of $16 million to the United States Treasury.

65.    SunTrust has also suffered significant damage to its reputation as a result of the Individual Defendants' misconduct.  In an article in the Corporate Crime Reporter published on July 7, 2014, Christy Romero, the SIGTARP, stated

that "[t]he negligence with which SunTrust administered its HAMP program is appalling, miserable, inexcusable, and repulsive."

66.    In the Quarterly Report on Form 10-Q filed with the SEC on August 6, 2014, SunTrust stated that the Company had incurred a $204 million pre-tax charge in the second quarter of 2014 in connection with the Mortgage Modification Investigation.

## D.   DOJ INVESTIGATION OF GSE LOAN-ORIGINATION PRACTICES

67.    On June 13, 2013, the FHFA-OIG issued a Systemic Implication Report ("SIR") identifying a possible weakness in the control process by which servicers remit mortgage proceeds to Fannie Mae.

68.    According to the SIR, the Office of Investigations for the FHFA is conducting a criminal investigation into significant mortgage modification fraud by a GSE mortgage servicer, primarily focused on the servicer's portfolio of loans that it manages on behalf of Fannie Mae.

69.    The FHFA-OIG noted in the SIR that "in numerous instances the servicer held HAMP trial payments in suspense accounts despite funds accumulating in excess of one full monthly contractual PITI [principal, interest, tax, and insurance] payment."  Furthermore, "if a borrower was determined to be ineligible for a permanent HAMP modification, the servicer sent a refund check of

funds held in suspense" and that the "funds held in suspense represent funds that should have been remitted to Fannie Mae."

70.     The FHFA-OIG concluded that the servicer did not follow the directives of Fannie Mae, failing to apply the funds to the mortgage loan and returning the unapplied funds to the borrower. This "allowed the servicer to make inappropriate business decisions regarding default management of borrowers' mortgage loans based on the premise that the borrowers were not making their mortgage payments."

71.     In a response attached to the SIR dated July 2, 2013, the Deputy Director for Division of Enterprise Regulation Jon Greenlee stated that the FHFA agreed with the FHFA-OIG recommendations, and that the FHFA was "aware of this servicer's poor performance."

72.     In January 2014, the DOJ notified STM of an investigation regarding the origination and underwriting of single-family-residential mortgage loans sold by STM to Fannie Mae and Freddie Mac.

73.     *The Wall Street Journal* reported on February 27, 2014 that the unidentified company mentioned in the June 13, 2013 SIR was SunTrust, according to people familiar with the matter. On March 31, 2015, SunTrust filed with the SEC a Quarterly Report on Form 10-Q. The Form 10-Q stated that, in

January 2014, STM received notice of a DOJ investigation regarding the origination and underwriting of single family residential mortgage loans sold by STM to Fannie Mae and Freddie Mac.

74.     In SunTrust's most recent Quarterly Report on Form 10-Q filed with the SEC on or about August 4, 2016, SunTrust stated that the investigation remains ongoing.

## E.   RESIDENTIAL FUNDING COMPANY LLC LAWSUIT REGARDING SALE OF MORTGAGES FOR SECURITIZATION

75.     In December 2013, Residential Funding Company LLC ("RFC") filed a complaint in the United States District Court for the Southern District of New York, later transferred to the United States Bankruptcy Court for that District, alleging that STM breached representations and warranties in the contract between STM and RFC for the sale of mortgage loans.

76.     Specifically, RFC alleges that of the $3.5 billion of mortgages STM sold to RFC, over 60% had one or more defects, such as overstated property values, understated loan-to-value ratios, or incorrect owner-occupancy information, causing the sold mortgage to fail to comply with contractual origination and underwriting standards.

77.    On February 3, 2015, the Bankruptcy Court denied SunTrust's Motion to Dismiss.  According to SunTrust's most recent Quarterly Report on Form 10-Q filed with the SEC on or about August 4, 2016, the case remains pending.

## F.   LAWSUITS REGARDING CHARGES INCIDENTAL TO MORTGAGE SERVICING

78.    Several homeowners filed class-action lawsuits alleging that STM overcharged them for force-placed insurance in exchange for unwarranted financial benefits paid by the insurance company to STM.

79.    One lawsuit, *Hamilton v. SunTrust Mortgage Inc. et al.*, 13-60749-CIV-JIC (S.D. Fla.), claimed that overpriced QBE Specialty Insurance Co. policies cost up to 15 times more than the policies they replaced, with the price either added to borrowers' mortgage or automatically deducted from mortgage escrow accounts.  The homeowners also allegedly were never notified how much more expensive the force-placed policies might be, or that a portion of the premiums might revert to SunTrust.

80.    STM settled this lawsuit, and several other class action suits making similar allegations, agreeing to implement a variety of changes to its force-placed insurance practices and procedures, in addition to a refund of 10.5% of the premiums paid by those homeowners who were charged for force-placed

insurance.  SunTrust placed more than 127,000 such policies during the six year class period, according to the settlement.

81.     The settlement was filed May 12, 2014, Preliminary Approval Order was filed June 18, 2014, and an Order of Dismissal on the motion for voluntary dismissal was entered January 23, 2015.

82.     Another lawsuit, *Douglas Morales v. SunTrust Mortgage, et al.*, 1:2014cv24552 (S.D. Fla.) involved activity relating to STM's relationship with Assurant as its lender placed insurance vendor, and was settled in 2015 for an undisclosed amount.

83.     Homeowners also filed a class-action lawsuit alleging that STM used a private mortgage insurer who provided kickbacks to STM.  Specifically, the case alleged that STM entered into illegal "captive reinsurance" arrangements with private mortgage insurers.  Plaintiffs contend that this arrangement violates the Real Estate Settlement Procedures Act ("RESPA") and results in unjust enrichment to the detriment of borrowers. The Homeowners were forced to pay the premiums for this insurance but were not involved in picking the insurer.  The first such lawsuit, *Thurmond v. SunTrust Banks, Inc.*, 11:1352 (E.D. Pa.), was filed in 2011. On June 26, 2014, the court granted, in part, and denied, in part, SunTrust's motion to dismiss, leaving claims for unjust enrichment, RESPA violations, and piercing

the corporate veil.  The case is currently stayed pending a ruling in a similar case in the Third Circuit.

## G.  ERISA CLASS ACTION LAWSUIT

84.    In July 2008, a class action complaint was filed in the United States District Court for the Northern District of Georgia, Atlanta Division (Civil Action No. 1:08-CV-3384-RWS) by a number of SunTrust employees.  The action was brought against the fiduciaries of SunTrust's 401(k) Savings Plan for breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA").   On August 17, 2016, the Court certified a class of SunTrust ERISA plan participants during the timeframe of May 15, 2007 to March 30, 2011.

85.    The Plaintiffs in the ERISA action allege that SunTrust was unsuitable for retirement savings accounts because of the corporate mismanagement occurring at the Company, the heightened risk brought about by its operations, and the diminished business prospects of the Company.  The Plaintiffs in the ERISA action further allege that, as a consequence of the fiduciary breaches, significant losses were suffered by the ERISA plan and its participants.  SunTrust is named as a defendant in the ERISA action and has incurred substantial expenses as a result thereof.

86.    The ERISA action is based on substantially similar misconduct as that at issue in this action.  The ERISA Action names Defendants Rogers, Ratcliffe, Wynn, Hughes, Linnenbringer, and Lienhard as defendants therein (the "ERISA Defendants").

## H.  PLAINTIFF'S DEMAND

87.    By letter to the SunTrust Board of Directors dated September 26, 2014 (the "Demand Letter"), the LR Trust, which acquired SunTrust stock on or about October 7, 2008 and has held SunTrust stock continuously since that time, demanded that the Board undertake specific action to recover the Company's damages from the culpable parties.  The Demand Letter further demanded that the Board take all necessary steps to install adequate compliance and internal control systems and effective corporate governance practices and procedures to prevent such misconduct and damages from occurring in the future.

88.    As noted above, SunTrust formed a Demand Review Committee (the "DRC"), a comERmittee of outside directors, to investigate and consider Plaintiff's Demand.  On July 28, 2015, counsel for the LR Trust corresponded with the DRC's counsel in furtherance of its Demand.  The letter inquired as to the progress of the DRC investigation and whether the investigation had, ten months after the Demand was made, reached a point where the process and progress could be

shared with counsel. The LR Trust's counsel pointed out that much of the information the DRC purported to be in the progress of investigating related to matters that were already resolved with federal and state governments and so must have already been internally investigated.

89. On November 11, 2015, the DRC notified counsel that the DRC had, after conducting what it determined to be a thorough investigation of the facts and circumstances potentially implicated by the claims and allegations in the Demand Letter, determined that no litigation is justified against any current or former Director, officer, or employee of SunTrust or STM with respect to the matters raised by LR Trust in the Demand Letter.

## DERIVATIVE ALLEGATIONS

90. Plaintiff brings this complaint derivatively in the right and for the benefit of SunTrust, pursuant to O.C.G.A § 14-2-741 and Federal Rule of Civil Procedure 23.1 to redress injuries suffered by SunTrust as a direct result of the violations of fiduciary and other common law duties by the Individual Defendants.

91. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

92. Plaintiff will adequately and fairly represent the interests of SunTrust and its public shareholders in enforcing and prosecuting their rights.

93.     The   Board's   refusal   of   Plaintiff's   Demand   was   irrational, unreasonable, and is not entitled to deference from the Court.  Moreover, the Board did not act on an informed basis and did not adequately investigate the issues raised in the Demand.  As such, its refusal of the Demand is not protected by the business judgment rule.

94.     The Board that rejected Plaintiff's demand consisted of 12 directors, 9 of whom served as directors during the time of the misconduct that resulted in the material damage to SunTrust described herein.  By any reasonable measure, these 9 members of the Board should have been excluded from the consideration of any shareholder demand, given that they were being called upon to investigate the misconduct that occurred on their watch.

95.     The Board has refused to make public the substance and particulars of the DRC investigation and the conclusions drawn by the DRC therefrom, casting substantial doubt on both the quality of the investigation and the rationale for its conclusions, as well as the independence and disinterest of the members of the DRC and the Board.

96.     The Demand refusal flies in the face of the facts.  SunTrust has been hammered with actions by the Department of Justice, Attorneys General of 49 states, various groups of customers, and business partners.  SunTrust has been

37

materially damaged, paying hundreds of millions of dollars to resolve these claims. The cause of the legal violations that led to these lawsuits that materially damaged the Company was its admitted lack of adequate internal controls, a deficient condition repeatedly flagged by SunTrust's internal auditors and that was either well known to, or recklessly disregarded by, the Director Defendants.

97.     Further, the Demand refusal was improper for the following, among other, reasons:

    i.    The decision to refuse the Plaintiff's Demand was made by the Board, rather than the DRC assembled to address the issues complained of herein, and the Board is not sufficiently independent or disinterested to properly consider the Demand;

    ii.    A majority of the Board has proven to be neither independent nor disinterested, but rather face a substantial likelihood of liability for the misconduct described herein.   The Board is comprised of the following directors:  Rogers, Garcia, Ivester, Legg, Morea, Ratcliffe, Scruggs, Watjen, Wynn, Beall, Hughes, and Linnenbringer.  Since at least the following Board members are, in fact, neither disinterested nor independent, they would be unwilling to bring suit against each other and were not disinterested for purposes of considering the Demand:

        (a)    Defendants Rogers, Garcia, Ivester, Legg, Morea, Ratcliffe, Scruggs, Watjen, Wynn, Beall, Hughes, and Linnenbringer participated in and oversaw the breaches of fiduciary duty and wrongful conduct alleged in the Demand Letter as directors of SunTrust during the time period that the misconduct took place. Accordingly, these Director Defendants face a substantial likelihood of liability for those actions and were not disinterested for purposes of considering the Demand.

(b)     Defendants Rogers and Lienhard lack independence as directors as a result of their managerial positions with the Company.

(c)     Defendants Legg, Watjen, Wynn, Beal, and Linnenbringer lack independence for purposes of considering the Demand because they, in addition to being directors, were Audit Committee members who were responsible for monitoring the Company's compliance with applicable laws, rules, and regulations. Moreover, the Audit Committee members were charged with reviewing ineffective-rated audit reports prepared by internal audit and management's responses as well as other significant reports to management, and so were certainly on notice of the numerous internal audit reports finding the Company's internal controls to be ineffective, that error rates ranged as high as 59%, that there was inadequate staff to properly perform required activities, and the staff the Company did have was not properly trained.  The Audit Committee members' breaches of fiduciary duties caused SunTrust to engage in practices that have resulted in massive potential liability for the Company. Accordingly, these Defendants face a substantial threat of liability for their actions and inactions as Audit Committee members and, therefore, are unable to independently consider the Demand and are not and were not disinterested for purposes of considering the Demand.

(d)     Defendants Garcia, Ivester, Morea, Ratcliffe, Scruggs, Watjen, and Hughes lack independence for purposes of considering the Demand because they, in addition to being directors, were Risk Committee members who were responsible for monitoring risks to the Company, but failed to take any action regarding the material risks caused to the Company as described herein.  The Risk Committee members' breaches of fiduciary duties caused SunTrust to engage in practices that have resulted in massive potential liability for the Company.  Accordingly, these Defendants fact a substantial threat of liability for their actions and inactions as Risk Committee members and, therefore, are unable to independently consider the Demand and are not and were not disinterested for purposes of considering the Demand.

(e)     Defendants Rogers, Ratcliffe, Wynn, Hughes, Linnenbringer, and Lienhard are named as defendants in the ERISA action (the "ERISA Defendants"), which complains that SunTrust was an unsuitable investment vehicle for the Company's retirement plan participants due to, among other things, the very mismanagement at issue here.

(iii)   The SunTrust Board has proven itself unwilling to bring remedial action against wrongdoers who have caused the Company substantial harm regarding conduct of which the Board was aware or improperly disregarded;

(iv)    SunTrust has admitted, among other things, that it "failed to provide effective oversight," including failing to have "adequate internal controls, policies and procedures, compliance risk management, internal audit, training and oversight of the foreclosure process." These deficiencies were known to, or recklessly disregarded by, the Director Defendants, but they allowed the deficiencies to persist and fester to the detriment of SunTrust and its stockholders, evidencing that their decision to refuse Plaintiff's Demand was an irrational and unreasonable attempt to avoid remunerating the Company for the damage caused by their inaction.

(v)     In the HAMP Settlement, Defendant Lienhard, President and CEO of STM admitted, "pursuant to authority vested in him by the Board of Directors of SunTrust Banks, Inc., the parent company of SunTrust Mortgage," that "there were numerous deficiencies in SunTrust's administration of the HAMP program from March 2009 through at least December 2010." These deficiencies were known to, or recklessly disregarded by, the Director Defendants, but they allowed the deficiencies to persist and fester to the detriment of SunTrust and its stockholders, evidencing that their decision to refuse Plaintiff's Demand was an irrational and unreasonable attempt to avoid remunerating the Company for the damage caused by their inaction.

(vi)    The numerous internal audit reports flagging ineffective internal controls and unacceptable error rates by employees ranging up to 59% of mortgage applications processed, as well as the many regulatory and civil actions brought against SunTrust, and the substantial

penalties, fines, and settlements paid by SunTrust pursuant to those actions, were red flags of illegal and improper activity that should have caused the Individual Defendants to investigate and take action to ensure that the Company complies with applicable laws, rules and regulations concerning its business.

(vii) The acts complained of herein constitute violations of statutory and common law fiduciary duties, which are incapable of ratification;

(viii) The Board has systematically failed to exercise oversight over the core business of the Company and over its officers and employees. In light of the fact that the illegal and improper conduct described herein took place within SunTrust's "core business," the Board's failure to either prevent or timely cause the termination of that conduct constitutes a breach of fiduciary duties for which the Board members face a substantial likelihood of liability;

(ix) In light of the facts and circumstances, including, but not limited to, the magnitude and duration of the illegal and improper conduct engaged in to the detriment of SunTrust and its shareholders, the Board's failure to either prevent or timely cause the termination of the conduct constitutes a breach of fiduciary duties for which the Board members face a substantial likelihood of liability;

(x) The Board has failed to ensure that an effective system of internal controls exists at SunTrust. Notwithstanding the obvious risks posed to SunTrust in failing to act in compliance with applicable laws and regulations governing the Company's core business operations, the Individual Defendants failed to implement a system of controls designed to monitor or mitigate those risks. Accordingly, the Individual Defendants are substantially liable as a result of their failure to perform their oversight duties as directors of the Company, for failing to ensure the Company's compliance with applicable laws and regulations governing its core business, for allowing the Company to engage in unsafe and unsound practices, and also for failing to ensure that reasonable information and reporting systems existed in order to elevate material issues to the Board;

(xi)   The Board has failed to commence any action against the principal wrongdoers despite the lengthy passage of time since their misconduct was revealed;

(xii)   The Board is "entrenched" and is unwilling to cooperate in any attempts to take steps to correct the flaws in the internal control and corporate governance policies and procedures; and

(xiii)   The DRC members have proven themselves to be neither independent nor disinterested.

## COUNT I
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

98.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

99.   Plaintiff fairly and adequately represents the interests of the Company and has made proper demand upon the Company's Board of Directors.

100.   As alleged herein, each of the Defendants had statutory and common law fiduciary duties to, among other things, exercise good faith to ensure that the Company met its obligations in underwriting and originating mortgage loans, as well as fulfilling its fiduciary duties, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

101.   In violation of their statutory or common law fiduciary duties, Defendants ignored the obvious and pervasive problems with SunTrust's internal

controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

102.   Defendants owed and owe SunTrust statutory and common law fiduciary obligations. By reason of their fiduciary relationships, Defendants specifically owed and owe SunTrust the highest obligations of good faith, fair dealing, loyalty, and due care.

103.   Defendants violated and breached their statutory and common law fiduciary duties of care, loyalty, oversight, good faith, and supervision.

104.   As a direct and proximate result of Defendants' failure to perform their statutory and common law fiduciary obligations, SunTrust has sustained significant financial, regulatory, and reputational damage.

105.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

106.   Defendants' failures were not an exercise of reasonable business judgment.

107.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT II
### AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

108.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.   Plaintiff fairly and adequately represents the interests of the Company and has made proper demand upon the Company's Board of Directors.

110.   Defendants had a statutory and common law duty to SunTrust and its shareholders to prudently supervise, manage, and control the operations, business, and internal controls of SunTrust.

111.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of SunTrust in a manner consistent with the duties imposed upon them by statutory and common law.  By committing the misconduct alleged herein, Defendants breached their statutory and common law duties of due care, diligence, and candor in the management and administration of SunTrust's affairs and in the use and preservation of SunTrust's assets.

112.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused SunTrust to engage in schemes complained of herein which they knew had an unreasonable risk of damage to SunTrust, thus

breaching their statutory and common law fiduciary duties to the Company. As a result, Defendants grossly mismanaged SunTrust.

113.   As a direct and proximate result of the Defendants' foregoing misconduct, the Company has sustained damages.

## COUNT III
### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

114.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.   Plaintiff fairly and adequately represents the interests of the Company and has made proper demand upon the Company's Board.

116.   By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of SunTrust.

117.   An inequity exists due to Defendants' unjust enrichment at SunTrust's expense and detriment.

118.   Plaintiff, as a shareholder and representative of SunTrust, seeks restitution from these Defendants, and each of them, and seeks an Order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding against all Defendants and in favor of SunTrust the amount of damages sustained by the Company as a result of Defendants' breaches of statutory and common law fiduciary duties and gross mismanagement;

B.      Directing SunTrust to take all necessary action to reform and improve its corporate governance and internal control practices and procedures to comply with applicable laws and best practices and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, amending SunTrust's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding SunTrust restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted this 3rd day of November, 2016.

> By: */s/ David A. Bain*
> David A. Bain
> Georgia Bar No. 032449
> LAW OFFICES OF DAVID A. BAIN LLC
> 1050 Promenade II
> 1230 Peachtree Street, NE
> Atlanta, GA  30309
> Telephone: (404) 724-9990
> Facsimile: (404) 724-9986
> dbain@bain-law.com
>
> *Plaintiff's Local Counsel*
>
> Joseph H. Weiss
> David C. Katz
> WEISSLAW LLP
> 1500 Broadway
> New York, NY  10036
> Telephone: (212) 682-3025
> Facsimile:  (212) 682-3010
> jweiss@weisslawllp.com
> dkatz@weisslawllp.com

Michael A. Rogovin
WEISSLAW LLP
691 John Wesley Dobbs Ave, NE C
Atlanta, GA 30312
mrogovin@weisslawllp.com


*Plaintiff's Counsel*